# In the United States Court of Federal Claims

No. 09-747C

(Filed August 6, 2010)

```
* * * * * * * * * * * * * * * * * * * * * * * * *
PENINSULA GROUP CAPITAL         *
CORPORATION                     *   Breach of Contract Claim;
                                *   Motion to Dismiss for Lack of Subject
           Plaintiff,           *   Matter Jurisdiction; RCFC 12(b)(1);
                                *   Failure to State a Claim; RCFC 12(b)(6)
    v.                          *
                                *
UNITED STATES,                  *
                                *
           Defendant,           *
                                *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

    *Steven W. Thomas*, Thomas Alexander and Forrester LLP, Venice, California, attorney of record for plaintiff.

    *Paul Davis Oliver*, U.S. Department of Justice, Civil Division, with whom was *Assistant Attorney General Tony West*, for defendant. *Jeanne E. Davison*, Director, *Donald E. Kinner*, Assistant Director; and *Toshene Fletcher*, Department of the Army, of counsel.

## OPINION AND ORDER

*Futey*, **Judge**.

    This case comes before the Court on Defendant's Motion To Dismiss for lack of subject matter jurisdiction, under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("Rules").[1]  Plaintiff, Peninsula Group Capital Corporation, alleges that defendant, the United States Army Reserve and Department of the Army, breached a contract to transfer real estate from defendant to plaintiff.  Plaintiff also brings two claims related to that contract: a breach of the implied covenant of good faith and fair dealing and a taking of plaintiff's personal property rights without compensation in violation of the Fifth Amendment.  Plaintiff seeks $8.25 million in damages, $200 million in lost profits, costs, and fees.

    Defendant responds that no contract exists between the parties.  Absent a contract, according to defendant, plaintiff's claims must be dismissed.  Before this Court are Defendant's

---

[1] As discussed below, the Court has construed this motion to also argue that plaintiff has failed to state a claim upon which relief can be granted, under Rule 12(b)(6).

Motion To Dismiss, Plaintiff's Opposition To Defendant's Motion To Dismiss, and Defendant's Reply To Plaintiff's Opposition To Defendant's Motion To Dismiss. Briefing was completed on May 6, 2010.

I. Background
    A.    *Peninsula Expresses Interest in the Army Reserve's Property.*

In 1997, the Army Reserve owned the McCoy U.S. Army Reserve Center and Aviation Support Facility 49 ("the ASF Property"), which is located at the Orlando International Airport in Florida. Because of force reductions scheduled for April 1999, the Army Reserve expected that it would no longer need this property. Plaintiff, an investment corporation that specializes in aviation and aeronautics, learned of this and expressed to the Army Reserve its interest in acquiring the ASF Property. After initial discussions, the parties decided to pursue a transfer of the ASF Property in exchange for renovations of another property that the Army Reserve owned.

The vehicle by which this transfer would occur was a real property exchange. Army regulations define this as "an option for the Army Reserve to supplement military construction by exchanging existing Army Reserve facilities for new facilities at another location." U.S. Dep't of Army, Reg. 140-483, Army Reserve Land and Facilities Management para. 5-9a (July 2007) ("Army Reg. 5-9"). The statutory authority for this type of exchange contains numerous requirements that must be met. 10 U.S.C. § 18240 (2008). Three of the requirements from the statute and the regulations are particularly relevant to this case. First, the person with authority to "sign a binding exchange agreement" is the Deputy Assistant Secretary of the Army for Installations and Housing ("the DASA"). Army Reg. 5-9e. Second, before an exchange agreement may be signed, the Secretary of the relevant military department must send a report with details of the proposed agreement to the congressional defense committees. 10 U.S.C. § 18240(f). Third, the agreement can only be made after a certain number of days—either 30 or 21 depending on a few technical factors—has elapsed after this report is delivered to Congress. *Id.* § 18240(f)(2).

    B.    *The Army Reserve Grants Concept Approval for the Transaction.*

The Army Reserve issued a concept approval for the proposed transaction on August 26, 1999. In a one-paragraph memorandum to plaintiff, DASA Paul Johnson, wrote:

> The proposed exchange of Army Reserve property located at the Orlando International Airport with the Peninsula Group Capital Cooperation [sic] (PGCC) is approved in concept. The PGCC will provide replacement construction and improvements to existing U.S. Army Reserve (USAR) facilities located in the Florida area. The approval is subject to the following conditions: (1) that the value received by the Army in this exchange is not less than the value of Army property conveyed to PGCC; (2) that the upgrade/expansion of the selected USAR facilities is done to Army specifications and otherwise is acceptable to Secretary of the Army; (3) that, if appropriate, covenants be incorporated in the

deed for the Army land to provide suitable use restrictions minimizing the environmental risk associated with that property.[2]

After receiving this concept approval, plaintiff invested large sums of money into the proposed transaction. According to the complaint, plaintiff employed a contractor, obtained permits, and attended numerous meetings with the Army Reserve and local government.

        C.      *Negotiations Continue for Several Years.*

Negotiations continued for several years after concept approval was granted. On April 24, 2002, the Army Reserve provided plaintiff with some "potential requirements" that would be included in the Exchange Agreement.[3] Also in that letter, the Army Reserve reiterated its desire to "work closely . . . . to develop a legally binding Exchange Agreement."[4] The list of potential requirements for the Exchange Agreement spans three pages, and throughout the list of requirements, the language indicates what "should be included" in a binding agreement and what "must" be done prior to such an agreement.[5]

One of the most detailed documents from negotiations was written by plaintiff and sent to the Army Reserve on July 25, 2003 ("the Proposal"). Plaintiff states in the Proposal that the parties "have expressed their intention for [plaintiff] to provide the Department of Army a replacement Army Reserve Center in Florida in exchange for existing USAR property in Florida."[6] Before laying out the exact details of the exchange, plaintiff writes:

> This Proposal is to establish and define the terms of negotiation leading to a legally binding Exchange Agreement that will set forth in detail the obligations of the parties. The parties acknowledge that this Proposal is not legally binding and that each is undertaking its commitments set forth herein for its own convenience and at its own expense and risk. Further, fulfillment of such commitments or completion of any other preliminary action in anticipation of an Exchange Agreement creates no legally binding obligation on either party to proceed. Either party may withdraw its interest in the Exchange process at any time prior to the execution of the Exchange Agreement.[7]

The Proposal then details the value of the properties, the environmental analyses required for an exchange, the National Historical Preservation Act's impact on the exchange, and many other particulars of the exchange. One section of the Proposal, entitled "Conditions Precedent to the Execution of an Exchange Agreement" provides four conditions required for an Exchange Agreement, and plaintiff writes, "It shall be specifically agreed and understood that any Exchange Agreement shall be expressly conditional upon the following having occurred . . . ."[8]

---

[2] Pl.'s Opp. Def.'s Mot. ("Pl.'s Opp."), App. 1.
[3] Def.'s Mot. Dismiss ("Def.'s Mot."), App. 2.
[4] *Id.*
[5] *Id.* at App. 3–5.
[6] Pl.'s Opp., App. 2.
[7] *Id.*
[8] *Id.* at App. 10.

These conditions include a written acceptance by the Army Reserve of plaintiff's plan, a leasehold agreement between plaintiff and the Greater Orlando Aviation Authority, a commitment by the Army Reserve to develop a Comprehensive Environmental Remedial Action Plan, and an agreement between the Army Reserve and the Florida State Historical Preservation Society.[9]

Plaintiff concludes the Proposal with this language: "Notwithstanding any language elsewhere herein set forth to the contrary, this Proposal is not a binding agreement and represents only an expression of current intent to continue negotiations of a binding Exchange Agreement. Neither party has agreed to any of the specific terms of the Exchange Agreement and both parties understand that either party may withdraw from further negotiations at any time prior to execution of the Exchange Agreement."[10]  Plaintiff, not defendant, drafted this document.

After defendant received the Proposal, Colonel Del C. Fougner of the Army Reserve wrote on September 17, 2003, "You state that the intent of your letter is to establish and define the terms of negotiation leading to a legally binding Exchange Agreement. It is a good start and the proposal looks promising."[11]  Colonel Fougner noted, however, "[W]ithout a signed and funded letter agreement with the Louisville District, Corps of Engineers, we are at a standstill. Once the funds are provided, I will have my office and the Louisville District, Corps of Engineers meet with you towards finalizing the exchange agreement, as expeditiously as possible."[12]

Colonel Fougner again wrote to plaintiff on February 9, 2004 ("the February response"). In this letter, Colonel Fougner states that "it is the intent of the Army Reserve Division and the Louisville District Corps of Engineers (COE) Real Estate Division to develop a legally binding Exchange Agreement in the near future."[13]  The letter then lists and "accepts" several recommendations or parts of Peninsula's proposal.  In concluding the response, Colonel Fougner writes, "The Government's representations and acceptance of the conditions herein are subject to the execution of an exchange agreement and final approval of the exchange agreement by the Deputy Assistant Secretary of the Army (Installations and Housing). . . .  We desire to complete this exchange no later than April 2004."[14]

      D.      *Congressional Legislation Affects the Negotiations.*

Despite the Army Reserve's avowed intent to complete the exchange by April 2004, no Exchange Agreement had been signed by August 2004.  At the start of that month, Michael Barter, Chief of the Army's Real Estate Division, contacted plaintiff "in reference to ongoing negotiations between your office and the U.S. Government concerning an exchange of real property . . . ."[15]  The purpose of the letter was "to inform [Peninsula] that there is pending

---

[9] *Id.*
[10] *Id.* at App. 12.
[11] Def.'s Mot., App. 18.
[12] *Id.*
[13] Pl.'s Mot., App. 13.
[14] *Id.* at App. 14.
[15] Def.'s Mot., App. 21.

legislation that may affect the completion of the exchange transaction [and] require the Army Reserve to solicit competitive offers for real property exchanges."[16]  On November 12, 2004, Barter sent plaintiff a letter telling them that the legislation had passed and that the "future intended use" of the ASF Property was being considered, since the Army Reserve now had to go through a competitive process for exchanges.[17]  The letter concludes, "Regretfully, the final outcome of previous ongoing negotiations between your office and the U.S. Government resulted in a failed attempt to officially consummate a formal executed agreement between the parties for the exchange of the Subject Property."[18]

Alarmed by this development, plaintiff wrote back that "the characterization of the process made toward an Exchange Agreement and the commitment to the Exchange by the [Army Reserve] and [Peninsula] as a 'failed attempt to officially consummate a formal agreement' is without merit."[19]  According to plaintiff, "The [Army Reserve] and [Peninsula] have not failed in their negotiations and [Peninsula] has not failed in meeting the [Army Reserve's] specifications and requirements for a new facility.  The parties are in agreement to proceed . . . ."[20]

The final correspondence included in the submissions to the Court is from January 13, 2005.  In a short, one-page letter, DASA Joseph Whitaker informed plaintiff that "the proposal has not yielded an exchange agreement.  Moreover, during the interim, events have occurred which change the conditions and assumptions under which concept approval was granted to pursue this exchange."[21]  DASA Whitaker then rescinded the concept approval for the exchange.  Under the regulations, as noted above, Whitaker was the individual with the authority to sign a binding Exchange Agreement.

E.     *The Greater Orlando Aviation Authority*

Throughout negotiations, plaintiff claims they were hampered by the Greater Orlando Aviation Authority ("the GOAA").  The GOAA is a unit of the State of Florida that operates the Orlando airport.  According to plaintiff, the GOAA repeatedly attempted to acquire the ASF property for no consideration.  When those efforts failed, plaintiff alleges that the GOAA used contacts with politicians and governmental authorities to pressure the Army Reserve to cease negotiations with plaintiff.  Plaintiff also alleges that the GOAA attempted to delay the exchange until the passage of the Congressional legislation described above.

Several of the documents submitted to the Court show a concern over GOAA activities.  In the Proposal, plaintiff stresses that "[i]ntegral to the execution of an Exchange Agreement between [Peninsula] and the [Army Reserve] is the cooperation of third party entities including

---

[16] *Id.*
[17] *Id.* at App. 22.
[18] *Id.*
[19] *Id.* at App. 25.
[20] *Id.*
[21] *Id.* at App. 26.

5

the Greater Orlando Aviation Authority . . . ."[22]  Indeed, one of the conditions precedent mentioned in the Proposal was a leasehold agreement between the GOAA and plaintiff.

F. *Procedural Background*

Plaintiff filed this suit on November 2, 2009 seeking $8.25 million in damages, $200 million in lost profits, costs, and fees. On March 19, 2010, defendant filed a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction. The parties have briefed this motion.

II. Discussion
   A. *Jurisdiction and Standards of Review*
      1. Subject Matter Jurisdiction

The Court of Federal Claims is a court of specific jurisdiction, and the Tucker Act sets the court's "jurisdictional reach." **Rick's Mushroom Serv. v. United States**, 521 F.3d 1338, 1346 (Fed. Cir. 2008). That Act waives the sovereign immunity of the federal government for certain claims brought in this court, including "claim[s] against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (2006). *See also* **Sanders v. United States**, 252 F.3d 1329, 1334 (Fed. Cir. 2001). No substantive rights are created by the Tucker Act, which merely allows this court to exercise jurisdiction over the federal government when a substantive right exists, such as when the government has breached a contract. *See* **United States v. Testan**, 424 U.S. 392, 398 (1976); **Hall v. United States**, 89 Fed. Cl. 102, 107 (2009).

2. Dismissal for Lack of Subject Matter Jurisdiction

A plaintiff must establish by a preponderance of the evidence facts sufficient to invoke this court's jurisdiction. **M. Maropakis Carpentry, Inc. v. United States**, No. 2009-5024, 2010 WL 2403337, at *2 (Fed. Cir. June 17, 2010). At the jurisdictional stage, a plaintiff does not need to prove these facts but "must only plead[]" sufficient facts. **Total Med. Mgmt., Inc. v. United States**, 104 F.3d 1314, 1319 (Fed. Cir. 1997). "A well-pleaded allegation in the complaint" that a contract exists "is sufficient to overcome challenges to jurisdiction." **Trauma Serv. Group v. United States**, 104 F.3d 1321, 1324 (Fed. Cir. 1997). Undisputed allegations in a complaint are "normally consider[ed] . . . to be true and correct." **Reynolds v. Army & Air Force Exch. Serv.**, 846 F.2d 746, 747 (Fed. Cir. 1988). *See also* **Massie v. United States**, 166 F.3d 1184, 1187 (Fed. Cir. 1999) ("[W]e accept as true the complaint's undisputed factual allegations."); **Warr v. United States**, 46 Fed. Cl. 343, 346 (2000).

A defendant may, however, "challenge[] the truth of the jurisdictional facts" that plaintiff has used to plead subject matter jurisdiction. **Reynolds**, 846 F.2d at 747. In the event that such a challenge has been made, "the party asserting jurisdiction must be given an opportunity to be heard before dismissal is ordered." *Id.* at 748. As part of this opportunity, the party asserting jurisdiction must support its jurisdictional facts by "competent proof." **McNutt v. Gen. Motors Acceptance Corp. of Ind.**, 298 U.S. 178, 189 (1936). *See also* **Rocovich v. United States**, 933

---

[22] Pl.'s Opp., App. 2.

6

F.2d 991, 994 (Fed. Cir. 1991) (party asserting jurisdiction may "submit relevant evidence" on the jurisdictional issue); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 668 (1997) ("If [defendant] challenges the truth of the jurisdictional facts alleged in the complaint, however, the court may consider relevant evidence in order to resolve the factual dispute."). After reviewing this evidence, a court should dismiss "only where it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Laudes Corp. v. United States*, 86 Fed. Cl. 152, 160 (2009).

### 3. Dismissal for Failure to State a Claim

If a plaintiff asserts facts that, even if true, would not entitle him or her to relief, then dismissal under Rule 12(b)(6) is proper. *See Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). A court must accept "all well-pleaded factual allegations as true and draw[] all reasonable inferences in the claimant's favor," while making this determination. *Lindsay*, 295 F.3d at 1257. In two recent cases, the United States Supreme Court has expanded on this standard. In the first case, the Court wrote that a party must show "enough facts to state a claim to relief that is plausible on its face" in order to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In the second case, the Court expanded on the plausibility standard and wrote that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009). *See also Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1354–55 (Fed. Cir. 2010) (citing the plausibility standard).

In suits against the government, "confusion" can sometimes "arise[]" when the facts establishing jurisdiction are intertwined with the merits of the case. *Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 688 (Fed. Cir. 1992). Two Supreme Court cases attempted to dispel some of this confusion. In the first case, the Court noted that "[i]f the complaint raises a [basis for subject matter jurisdiction], the mere claim confers power to decide that it has no merit, as well as to decide that it has." *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 249 (1951). In the second case, the Court wrote that jurisdiction "is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Bell v. Hood*, 327 U.S. 678, 681 (1946). Citing to these cases, the United States Court of Claims stated that "[t]hese same principles have applied, and still apply, to this court, within the ambit of its limited jurisdiction." *Ralston Steel Corp. v. United States*, 340 F.2d 663 (Ct. Cl. 1965). More recently, the Federal Circuit has held that "a non-frivolous allegation of the existence of an implied-in-fact contract" is sufficient to confer jurisdiction upon this court and allow it to reach the merits of the claim. *Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed. Cir. 2000).

Although defendant has only brought a motion to dismiss for lack of jurisdiction under Rule 12(b)(1),[23] the Federal Circuit has held that it is sometimes appropriate to so convert such a

---

[23] Defendant did, however, write in its motion that it believes its "attack on the jurisdictional basis of Peninsula's complaint—based upon the absence of a contract between the parties—might also provide a basis for finding that the complaint fails to state a claim upon which relief may be granted under RCFC 12(b)(6)." Def.'s Mot. 5.

7

motion into a motion to dismiss for failure to state a claim. In a case where the plaintiffs had alleged that they had contracts with the government, the Federal Circuit, in affirming the ultimate result of the case, found that the Court of Federal Claims had "erred in dismissing [the plaintiffs'] claim for lack of jurisdiction rather than on the merits." **Oswalt v. United States**, 41 Fed. Appx. 471, 472 (Fed. Cir. 2002). According to the Federal Circuit, the trial court "should have converted the government's motion to dismiss for lack of jurisdiction either to a motion under [Rule 12(b)(6)] for failure to state a claim, or to a summary judgment matter . . . ." *Id.* at 473. In this case, the Court believes that defendant's motion should also be construed as one for failure to state a claim upon which relief can be granted, under Rule 12(b)(6). Plaintiff has made a "non-frivolous allegation" that allows this court to reach the merits of this case: whether or not the parties formed a contract. **Hanlin**, 214 F.3d at 1321. In this case, construing defendant's motion to include Rule 12(b)(6) does not prejudice plaintiff, since the critical issue of whether a contract was formed remains the same and has been fully briefed by the parties.

        4.        <u>Contract Pleading Requirements under the Rules</u>

Defendant has also challenged plaintiff's complaint for a failure to adhere to the pleading requirements set forth in Rule 9(k). That rule requires that "[i]n pleading a claim founded on a contract or treaty, a party must *identify the substantive provisions of the contract* or treaty on which the party relies. In lieu of a description, the party may annex to the complaint a copy of the contract or treaty, indicating the relevant provisions." Rule 9(k) (emphasis added). *See* **Mendez-Cardenas v. United States**, 88 Fed. Cl. 162, 168 (2009) (finding that plaintiff did not "point to any provision of the alleged contract" entitling him to relief and had thus not met Rule 9(k)'s standards); **Phang v. United States**, 87 Fed. Cl. 321, 329–330 (2009) (finding that plaintiff "does not point to any specific provisions" of a contract that would entitle him to relief).

    B.    *The Parties Did Not Form a Contract.*
        1.        <u>Elements Required to Form a Contract with the Government</u>

A contract requires "a mutual intent to contract including offer, acceptance, and consideration . . . ." **Total Med. Mgmt., Inc. v. United States**, 104 F.3d 1314, 1319 (Fed. Cir. 1997). *See also* **Quiman, S.A. de C.V. v. United States**, 39 Fed. Cl. 171, 177 (1997). In addition to these standard requirements, the government cannot be bound to a contract except by a government agent with actual authority to bind the United States. *See* **Trauma Serv. Group v. United States**, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Because of this final element of a government contract, "[a]nyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority." *Id.*

Suit may be brought in this court based either on an express or an implied-in-fact contract. **Hercules, Inc. v. United States**, 516 U.S. 417, 423 (1996).[24] An implied contract is much the same as an express contract; both require a meeting of the minds and a showing of mutual intent to be bound. *See* **Balt. & Ohio R. Co. v. United States**, 261 U.S. 592, 597 (1923);

---

[24] This court lacks jurisdiction to hear implied-in-law or quasi-contracts. *See* **Hercules**, 516 U.S. at 423; **Sanders v. United States**, 252 F.3d 1329, 1334 (Fed. Cir. 2001).

***Russell Corp. v. United States***, 537 F.2d 474, 482 (Ct. Cl. 1976). With an implied contract, however, the nature of the evidence showing this intent will differ. Under an implied contract, courts will infer a meeting of the minds from the *conduct* of the parties, rather than from their express words. *See* ***Balt. & Ohio***, 261 U.S. at 597 ("[A]n agreement 'implied in fact,' founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.").

Courts have frequently held that "in negotiations where the parties contemplate that their contractual relationship would arise by means of a written agreement, no contract can be implied." ***Pac. Gas & Elec. Co. v. United States***, 3 Cl. Ct. 329, 339 (1983). *See also* ***Essen Mall Props. v. United States***, 21 Cl. Ct. 430, 439–440 (1990); ***City of Klawock v. United States***, 2 Cl. Ct. 580, 585 (1983), *aff'd* 732 F.2d 168 (Fed. Cir. 1984). This necessarily follows from the view that a contract is founded upon a meeting of the minds; when the parties "intend that their negotiations shall be finally reduced to writing and signed by them as evidence of the terms and conditions of the agreement, there exists no binding contract until the written contract setting forth such terms and conditions is executed." ***Ship Constr. & Trading Co. v. United States***, 91 Ct. Cl. 419, 1940 WL 4096, at *24 (1940).

2. The Party's Statements Did Not Create an Express Contract.

Plaintiff argues that a contract exists between defendant and itself. Plaintiff alleges that its July 2003 Proposal constituted an offer and that defendant's February 2004 Response was an acceptance of that offer. Furthermore, plaintiff alleges that defendant verbally confirmed that acceptance in a February phone call to plaintiff. Defendant challenges these assertions.

The July Proposal was not an offer. The Restatement defines an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."[25] Restatement (Second) of Contracts § 24 (1981). *See also* ***Anderson v. United States***, 344 F.3d 1343, 1353 (Fed. Cir. 2003); ***Essen Mall***, 21 Cl. Ct. at 439. The language plaintiff used in that letter, however, clearly indicates that it was not an offer. Plaintiff wrote that the purpose of the Proposal was "to establish and define the terms of negotiation leading to a legally binding Exchange Agreement" and that the Proposal itself was "not legally binding."[26] Plaintiff also wrote that no legal obligations between the parties would arise until the signing of an "Exchange Agreement" and that "either party may *withdraw* from further negotiations *at any time prior to execution of the Exchange Agreement*."[27] For a statement or action to be an offer, the party to accept must be justified in "understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24. Here, defendant would not have been justified in believing that. According to the language in plaintiff's Proposal, even if defendant

---

[25] The Restatement covers the common law of contract formation. As the Federal Circuit has noted, "It is well settled by long-standing precedent that the common law of contract governs the creation of a contractual relationship between the United States and a private party." ***Anderson***, 344 F.3d at 1353 n.4.

[26] Pl.'s Opp., App. 2.

[27] *Id.* at App. 12.

had immediately responded by writing "I accept the offer contained in your July 25, 2003 letter," then no contract would have been formed because no legal obligations would arise until the signing of an Exchange Agreement.

Even assuming that plaintiff's Proposal was an offer, defendant's February Response was not an acceptance. The Restatement defines an acceptance as a "manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." Restatement (Second) of Contracts § 50 (1981). This acceptance must be unambiguous. *Essen Mall*, 21 Cl. Ct. at 440. In the Response, defendant wrote that it "accepts the Draft Design/Build Proposal from American Bridge Company/CH2MHill."[28] Plaintiff claims that this was an unequivocal acceptance. That argument, however, ignores the rest of the letter, as well as the applicable regulations. At the start of the Response, defendant had written that it was the government's "intent . . . to develop a legally binding Exchange Agreement in the near future."[29] This calls into question an interpretation of the Response as an acceptance creating a binding contract, since defendant states that it hopes to be bound in the future, not in the present. Furthermore, defendant wrote that its "representations and *acceptance* of the conditions herein are *subject to the execution of an exchange agreement* and final approval of the exchange agreement by the Deputy Assistant Secretary of the Army (Installations and Housing)."[30]

The language defendant used does not manifest the "unambiguous acceptance" required to accept an offer and create binding contractual obligations. *See Essen Mall*, 21 Cl. Ct. at 440. Defendant explicitly stated that everything it said was "subject" to approval by the DASA and signing of a written agreement. The existence of such a condition prevents an interpretation of defendant's letter as an "unambiguous acceptance," since defendant explicitly acknowledged that it was not binding itself by what it wrote. A statement does not act as an acceptance if it "is in any respect conditional" or if it "reserves to the party giving it a power of withdrawal . . . ." *Uniq Computer Corp. for Benefit of U.S. Leasing Corp. v. United States*, 20 Cl. Ct. 222, 230 (1990) (internal quotations removed). In its February Response, defendant only stated its intent to pursue negotiations. This is insufficient to create a contract, since "[a] mere statement of intention . . . is not enough to manifest an unambiguous acceptance of an offer, especially when coupled with a condition precedent." *Essen Mall*, 21 Cl. Ct. at 440.

Defendant's conditioning of any acceptance on the execution of an exchange agreement is similar to the situation in *Essen Mall Properties*, where the plaintiff claimed that it had entered into an agreement to lease a piece of property to the defendant, the United States Postal Service. *Essen Mall*, 21 Cl. Ct. at 432. Over the course of a year, the parties negotiated and exchanged numerous documents. As with this case, the defendant had stated its "intention" to complete the agreement but also acknowledged that "[s]everal items must be approved and agreed upon . . . prior to any signed contract." *Id.* at 433. The defendant later wrote that the amount of rent "has been approved" but that the "agreement is to be executed after awarding a construction contract" for improvements to the building. *Id.* at 435. Eventually, however, the defendant did not receive the funding it needed for improvements and declined the plaintiff's offer. *Id.* at 437. The plaintiff sued for breach of contract, but the United States Claims Court held that the defendant

---

[28] *Id.* at App. 13.
[29] *Id.*
[30] *Id.* at App. 14 (emphasis added).

did not "unambiguously manifest its acceptance of plaintiff's offer to lease, but rather clearly [informed] plaintiff that the [defendant's] acceptance [was] contingent upon cost and other factors." *Id.* at 440. Furthermore, regulations required the defendant to execute a written contract. *Id.* at 441. The court noted that this was a case in which the defendant's acceptance was conditioned upon several events; since those events did not occur, no agreement was formed. *Id.* at 441. Similarly in this case, defendant maintained throughout the negotiations that its statements and acceptances were all "subject to" approval by the DASA and signing of the Exchange Agreement.

In a case involving a real property exchange, the United States Court of Claims discussed how a contract could not arise until regulations requiring the approval of a superior were followed. In that case, *Russell Corporation v. United States*, the plaintiff argued that it had a contract with the defendant to exchange some of the plaintiff's property for some of the defendant's property. ***Russell Corp. v. United States***, 537 F.2d 474, 476 (Ct. Cl. 1976). Under applicable regulations, the defendant's regional office, which was negotiating the transfer, was required to obtain approval from a central office. *Id.* at 477. All of the parties involved knew that this approval was required before a binding agreement could be made. *Id.* at 482. After the regional office had submitted the agreement for approval, the regional office decided to withdraw from negotiations. *Id.* at 483. The plaintiff argued that either an express or an implied-in-fact contract had been formed. *Id.* at 476. The Court of Claims disagreed in both regards and focused its analysis upon the fact that all parties knew that a required condition for an agreement was the approval of the central office. *Id.* at 481, 483. Before this approval was obtained, no contract could arise. *Id.* at 483 ("[A]ll parties understood and agreed that the exchange would not be completed until there had been compliance with the applicable regulations.").

Plaintiff uses a Federal Circuit decision to argue that any conditions precedent in this case did not prevent formation of a contract. That case, *Wells Fargo Bank*, involved a very different contractual situation that prevents plaintiff's analogy from succeeding. ***Wells Fargo Bank, N.A. v. United States***, 88 F.3d 1012, 1019 (Fed. Cir. 1996). The contract in that case was a unilateral contract; the government had promised to be contractually bound to the plaintiff, if the plaintiff performed a series of conditions. *Id.* at 1015. The Federal Circuit wrote, "That the government's promise to issue the loan guarantee was contingent upon [plaintiff's] performance of numerous conditions does not make the promise any less binding. Indeed, the essence of a unilateral contract is that one party's promise is conditional upon the other party's performance of certain acts and when the other party performs, the first party is bound." *Id.* at 1019. In this case, plaintiff has not alleged that a unilateral contract exists, and none does. Both parties during negotiations recognized that their statements and acceptances were subject to the execution of an exchange agreement, and plaintiff itself wrote that "either party may withdraw . . . . at any time prior to execution of the Exchange Agreement."[31] This prevented a contract from forming, because neither party intended to be bound by their statements. *See **Uniq Computer***, 20 Cl. Ct. at 230 (noting that a statement is not an acceptance if it "reserves to the party giving it a power of withdrawal").

---

[31] Pl.'s Opp., App. 12.

Plaintiff also claims that, in this case, one of its employees received a phone call indicating defendant's acceptance of the offer. According to plaintiff, Colonel David B. Trumbull called Brian Fedor, plaintiff's Managing Director, on February 9, 2004. During this phone call, Colonel Trumbull allegedly indicated to plaintiff defendant's "unambiguous Acceptance."[32] Colonel Trumbull disputes ever making such a call, but, regardless of that factual dispute, plaintiff has a larger problem: Colonel Trumbull was merely a government contractor and lacked authority to bind the government. As discussed above, the government can only be bound on a contract by an agent with actual authority to bind it. *See **Trauma Serv. Group v. United States***, 104 F.3d 1321, 1325 (Fed. Cir. 1997). The relevant regulations here specify that only the DASA can bind the government. 10 U.S.C. § 18240(a); Army Reg. 5-9e. Colonel Trumbull, a non-government employee, could not bind the government to a contract.

No contract ever came into existence in this case. Both parties here in numerous documents stated their belief that a binding exchange agreement would consummate the negotiations. Defendant did state its intention to be bound in the future, but, as in *Essen Mall*, plaintiff was aware that the defendant's statements of intent to contract were contingent upon a number of factors. ***Essen Mall***, 21 Cl. Ct. at 440. Furthermore, as in *Russell Corporation*, the parties "understood and agreed that the exchange would not be completed until there had been compliance with the applicable regulations," which required approval of the DASA. ***Russell Corp.***, 537 F.2d at 483. Defendant never indicated its unambiguous, unconditional acceptance of the contract, and no express contract was formed.

### 3. The Party's Conduct Did Not Create an Implied-In-Fact Contract.

Plaintiff also alleges that an implied-in-fact contract was created. An implied-in-fact contract is "'an agreement . . . founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" ***Barrett Ref. Corp. v. United States***, 242 F.3d 1055, 1059 (Fed. Cir. 2001) (quoting ***Balt. & Ohio R. Co. v. United States***, 261 U.S. 592, 597 (1923)). This type of contract requires the existence of the same elements as an express contract. *See, e.g.*, ***Barrett Ref.***, 242 F.3d at 1060; ***Ryan v. United States***, 57 Fed. Cl. 731, 733 (2003).

Plaintiff's argument faces two large problems. First, plaintiff has pointed to few facts from which the Court could imply a contract. Plaintiff cites a June 2, 2004 letter from the United States House of Representatives Committee on Armed Services that approved of the Army's "proceeding with" the real property exchange.[33] Plaintiff also points out a June 15, 2004 letter from Colonel Fougner to the Mayor of Fort Myers, Florida in which Colonel Fougner stated, "We believe that this exchange is good for the Army . . . . If you desire, we would be more than happy to provide you additional information on this potential exchange."[34] The Court cannot imply a contract from either of these pieces of evidence. As to the prior letter, the Committee on Armed Services lacks any authority to bind the government to this contract, and the regulations contemplate only notification and approval of an exchange by that Committee.

---

[32] Pl.'s Opp. 12.
[33] Pl.'s Opp., App. 15.
[34] *Id.* at App. 20.

Army Reg. 5-9d. As to the latter letter, Colonel Fougner also lacks authority to bind the government, and he furthermore only refers to the exchange as "potential." The final piece of evidence plaintiff cites is that DASA Whitaker used the word "rescind" when he wrote plaintiff that he was "rescinding the concept approval" for the proposed exchange.[35] According to plaintiff, "rescission" is for contracts, and if defendant were rescinding something, then a contract must have existed. In support of this argument, plaintiff cites an article that appeared in *The Army Lawyer* discussing the rescission of contracts. This argument, based purely on semantics, cannot stand. The word "rescind" can be used in many contexts; here, it was particularly appropriate for defendant to "rescind" concept approval and thereby officially terminate the parties' negotiations. The Court will not imply a contract simply because defendant used a word that also refers to a legal concept.

Plaintiff's second problem is that courts will not readily infer a contract when the parties have contemplated being bound only by a written agreement. The United States Claims Court wrote that "in negotiations where the parties contemplate that their contractual relationship would arise by means of a written agreement, no contract can be implied." ***Pac. Gas & Elec. Co. v. United States***, 3 Cl. Ct. 329, 339 (1983). In this case, even according to plaintiff, the parties did not plan to be bound except by the Exchange Agreement. Plaintiff wrote in the Proposal that "preliminary action in anticipation of an Exchange Agreement creates no legally binding obligation on either party to proceed" and that "[e]ither party may withdraw its interest in the Exchange process at any time before the execution of the Exchange Agreement."[36] The Court agrees that no legally binding obligations arose and that defendant justifiably withdrew from negotiations.[37]

      C.    *Plaintiff's Other Claims Require the Existence of a Contract.*

Plaintiff has made two other claims. First, plaintiff brings a claim for breach of the implied covenant of good faith and fair dealing in a contract. This duty is inherent in every contract. ***Precision Pine & Timber, Inc. v. United States***, 596 F.3d 817, 828 (Fed. Cir. 2010); Restatement (Second) of Contracts § 205. Since this Court finds that no contract arose between the parties, no such duty is implied between them. Second, plaintiff alleges a taking in violation of the Fifth Amendment of plaintiff's contractual rights and interest in defendant's properties. For a plaintiff to have a Fifth Amendment cause of action, there must be a "protectable property interest." ***Palmyra Pac. Seafoods, L.L.C. v. United States***, 561 F.3d 1361, 1364 (Fed. Cir. 2009). A contract right can be such an interest, *id.* at 1365, but the Court here finds that no contract existed between the parties. Absent a contract, these claims cannot proceed.

III.    <u>Conclusion</u>

The allegations of the complaint and the material submitted by plaintiff do not plausibly support the argument that a contract was ever formed. Considering the time and money plaintiff

---

[35] *Id.* at App. 23.

[36] *Id.* at App. 2.

[37] Since the Court finds that plaintiff has not plausibly supported its argument that a contract exists, it is unnecessary to reach defendant's argument that plaintiff did not meet the pleading requirements of Rule 9(k).

invested in this venture, it is unfortunate for plaintiff that no binding agreement between the parties was ever reached.  Plaintiff itself, however, recognized in July 2003 that each party was negotiating "at its own expense and risk" and that completion of any "preliminary action in anticipation of an Exchange agreement creates no legally binding obligation on either party to proceed."[38]  Since no contract was formed, defendant's motion, as construed by the Court, is GRANTED.  The Clerk is directed to dismiss plaintiff's complaint.  No costs.

    IT IS SO ORDERED.

                                                                         **s/Bohdan A. Futey**
                                                                         **BOHDAN A. FUTEY**
                                                                              **Judge**

---

[38] Pl.'s Opp., App. 2.